## HUNT VS. GAINES ET AL.

TAX SALE: *Purchase by one receiving rents.*
A purchase of lands at tax sale by one who is receiving the rents and profits, and ought to keep down the taxes, can never strengthen his title.

APPEAL from *Chicot* Circuit Court in Chancery.

Hon. T. F. SORRELLS, Circuit Judge.

*Valentine*, and *Street* and *Garland*, for appellant.

*Rose, contra.*

### STATEMENT.

EAKIN, J. :

On the 4th day of December, 1858, Frances M. Terry, her trustee, Abner Gaines, and her husband, George G. Terry, sold and conveyed to William F. Smith and Daniel W. Adams, for $20,000 in cash, and a balance secured by notes, a plantation designated as the "Vaucluse Place," with all the stock, corn, fodder, hogs, horses, thirty average mules, farming implements, one-half the sheep, and all other property on the place.

The credit payments, for which a lien was reserved, were secured by five several notes, for $12,954.75 each, payable at one, two, three, four and five years, with interest at 6 per cent. from the 1st day of January, 1859. The lands were set forth by the usual descriptions of the government surveys.

On the 5th of December, 1860, Wm. F. Smith, executed to his own order, endorsed and delivered to J. J. Persons & Co.,

of New Orleans, twenty promissory notes for $5000 each, due respectively, October 9th, 1861; October 30th, 1861; November 12th, 1861; November 20th, 1861: November 24th, 1861; December 8th, 1861; December 18th, 1861; December 31st, 1861; January 8th, 1862; January 30th, 1862; March 21st, 1862; March 25th, 1862; March 27th, 1862; March 30th, 1862; March 31st, 1862; April 6th, 1862; April 12th, 1862; April 17th, 1862; April 23d, 1862; April 30th, 1862; all to bear interest at the rate of 10 per cent. per annum, from maturity.

To secure their payment he executed to Daniel W. Adams and James H. Duncan, of New Orleans, and the survivors of them, a deed of trust of the plantation then known as the "Vaucluse Plantation," setting forth lands by the government surveys, together with other lands not included in the description of said plantation, in the original conveyance. Also 105 negro slaves, and the horses, mules, stock, cattle, and farming utensils on the place. They were authorized to sell on default, pay the notes, and reconvey the balance of the lands, property or proceeds, to the grantor. This was duly filed for record, December 24th, 1860.

A large portion of these lands were sold for taxes of 1866, as delinquent, on the 15th of April, 1867, and bid off by Chapman & Carlton. No deed appears to have been executed to them. The lands were allowed to become delinquent again for taxes of 1867, and on the 29th day of May, 1868, they were again sold, and bid off by A. L. Gaines, a tax deed for said lands so purchased was not executed until March 12th, 1873, when one was executed by the Clerk of the Court.

On the 19th of December, 1866, in a suit, by attachment, of *Jno. Cate* v. *Wm. F. Smith*, a part of the same property, with other lands not included in either mortgage, was attached. The lands were subsequently sold under order of court in the

attachment suit, on the 20th December, 1869, and purchased by Abner L. Gaines, who obtained the Sheriff's deed.

At the April Term, 1867, suit to foreclose the first mortgage was brought in the Chicot Circuit Court, in the name of "The Crescent City Bank," for the use of herself and of James B. Johnson and Thomas S. Serrills, who severally held the last four notes of the first mortgage. At the December Term, 1867, the lands were condemned to be sold for the lien, and a Commissioner appointed. The sale was duly made, and the lands purchased by Abner L. Gaines, for the sum of $500, to whom the Commissioner executed a deed on the 8th day of June, 1868. The debt, as ascertained by the decree, upon all four of the notes, amounted to $51,819 of principal, and $27,774 96-100 of interest. In this suit said Smith, Adams, Duncan, and the members of the firm of J. J. Persons & Co., were made defendants, and order of publication made against them as non-residents.

Out of these complications arose the present suit, which was begun on the 12th day of August, 1870, and is brought by Thomas H. Hunt (under the firm name of Thomas H. Hunt & Co.), and other creditors of William F. Smith, against said Smith, Abner L. Gaines, "The Crescent City Bank," Jas. B. Johnson, Thos. S. Serrill, Dan. W. Adams, James H. Duncan and the firm of J. J. Persons & Co.

Complainant alleges that he is the owner of two of the notes of Smith, secured by the second mortgage (due November 21st and December 28th, 1861), and that he believes all the others have been paid; or, if not, are held by parties unknown, whom he desires to make defendants, when discovered.

He charges that said Gaines and Smith, in pursuance of a fraudulent agreement, made an arrangement with the Crescent City Bank, and others holding the paper of Smith, secured by the first mortgage, ostensibly for the benefit of Gaines, but

with money furnished by Smith, whereby the payment of a large sum in cash, and a further payment upon time, the mortgage notes were transferred to said Gaines. That Gaines, having come into possession of the four notes, brought the suit in the name of the Crescent City Bank, for her use and that of Johnson and Serrill, without the knowledge of either of them, and bought in the property, upon the sale for foreclosure.

That in further pursuance of the fraudulent design, Smith omitted to pay the taxes for 1866, and the lands were purchased in by Gaines as delinquent; and that doubting the validity of the sale, he allowed them to be again sold for the taxes of 1867, and to be again purchased by Gaines. That in each case the lands were bought for the benefit of Smith and paid for with his means. The proceedings in Cate's attachment suit are recited and the purchase of the lands under that sale by Gaines for the sum of $1500.

Further he alleges that Gaines falsely pretends that Smith owes him money, but that in fact he is indebted to Smith in a large sum, and that these proceedings were designed to hide Smith's property from his creditors; that Gaines in all these proceedings was the trustee of Smith; that the decree of foreclosure of the first mortgage was fraudulent, inasmuch as the notes had been in a great part paid by money furnished by Smith, and that complainant was not a party to the first mortgage suit, and knew nothing of the fraudulent intent. He prays that all these deeds to Gaines may be cancelled; that an account be taken of what is due on the first mortgage notes, and also of the amount due from Gaines to Smith, and a decree for that against Gaines, as well as for the rents and profits of what he made, or should have made, on the plantation, and that the residue, if more than the first mortgage notes, be paid to complainants, and that his lien be declared on

the land and personal property, subject to any unpaid portion of the first mortgage ; and for foreclosure and sale.

A decree *pro confesso* was entered against Smith, Adams, Duncan and J. J. Persons & Co.

Gaines, answering, denies all fraudulent arrangement regarding the purchase from the bank, but says that with his own money he bought from the bank an interest in the mortgage note it held, to the extent of $4500 with the privilege of purchasing the remainder on the same terms. He admits that he did so at Smith's request, as an act of friendship, but with his own money, without fraudulent intent. He denies that he came into possession of the four notes sued on, or caused the suit. He merely recommended an attorney to the bank, and had no connection with Serrill and Johnson ; says that his purchase at the foreclosure sale was fair, legal and without fraud. He bought the land at the tax sales with his own money, and without any understanding with Smith, intending the purchase as a security for his claim, and so with regard to the purchase under attachment. He denies his indebtedness to Smith, denies all fraud and collusion, and prays that his answer be taken as a cross-bill, and his title to the property confirmed.

James B. Johnson, answering, says that he was the holder of one of the first mortgage notes, which he had placed in the hands of Hays & Adams, of New Orleans, for collection. Through these attorneys and Gaines, acting for Smith, it was agreed, that upon the payment of 25 per cent. in cash, and a credit payment to be made on the 1st of June, 1867, Smith was to be released from the balance. The credit payment failed, and the mortgage notes were forwarded to Johnson Chapman, Esq., for foreclosure. Gaines never had any interest in the notes or the suit. He joins in the prayer of the bill for relief.

Serrill, answering, says he owned two of the first mortgage notes, which were forwarded to Chapman for foreclosure. Gaines had no interest in them at all nor right to sue. He also joins in the prayer of the bill.

The bank, answering, says it placed one of the first mortgage notes in the hands of Hayes & Adams. These attorneys agreed with Gaines, acting for Smith, that upon a cash payment of $4500, and a future payment of a further sum amounting in all to 50 per cent., Smith was to be released. The cash payment was made, and on the failure of the other, which was to have been made on the 1st of January 1867, the note was forwarded to Chapman for foreclosure. Gaines never had any right or title to. it. The bank joins also in the prayer of the bill.

Wm. F. Smith does not answer the original bill, but answering the cross-bill of Gaines, denies all fraudulent collusion as to the purchase of the notes. He says that he was a discharged bankrupt, and furnished the money to purchase an interest in the notes for his (Smith's) benefit. The whole agreement was for his benefit and was not intended as a purchase, but a payment. The arrangement, if carried out, would have been with his money. Any assignment to Gaines was without his knowledge, and would have been a fraud on him. Gaines did not furnish the money, and had no right to the lands purchased. Did not know of any fraud on Gaines' part until he found him claiming the lands as his own. He says he paid the purchase money of the lands bought at the sale under the decree, and that Gaines bought the tax titles with intent to defraud him. He himself furnished all the moneys expended, and says that Gaines owes him about $4500, and denies that Gaines had been in possession of the lands for a year, or any period of time, before filing his cross-bill. He says also that the purchase under attachment was made for his benefit.

Upon these pleadings, and a mass of exhibits and depositions, the cause was submitted to the court, which decreed that the title of the lands (describing them) be confirmed to Gaines, and that he recover costs. Complainant appealed.

### OPINION.

The testimony in this case is, on both sides, vague and unsatisfactory; and between Gaines and Smith hopelessly irreconcilable. The onus of the proof of fraud lies upon the complainant and appellant, otherwise the parties must stand upon their rights as shown by their deeds, and the records of the courts.

Upon this point it is sufficient to say, that whilst the evidence indicates that the whole action of Gaines was prompted, originally, by a desire to assist Smith in keeping his property, and working through his embarrassments, there is no preponderance of evidence that he intended to do so fraudulently, or at his own expense, without retaining securities for moneys advanced; or that he ever used funds of Smith in such manner as to raise a resulting trust in any of the lands in Smith's favor.

He was the friend of Smith and disposed to indulge him. It would have been to Smith's advantage during the continuance of these friendly relations, that Gaines should purchase and hold the first mortgage notes, and the second mortgagees were not interested in the amount to be paid for them. It is very plain that the first mortgage notes were not worth their face value, as their amount largely exceeded the value of the lands which constituted their principal security. It was absolutely hopeless, that any of the property embraced in the first mortgage would become available for the notes secured by the second. The utmost right of the *cestuis que trust* under the second mortgage, was to redeem the land by paying off the

first mortgage notes, a thing which they never offered to do—
nor do not now—and obviously cannot, since the amount
acknowledged to ·be due and unpaid, admitting all credits,
claimed—quadruples the value of the lands.   It is a matter of
indifference to them whether the lands, under the decree  of
sale, brought $500 or the full amount of the debt.   Even if
the second incumbrancers were not made parties, so as to cut
off their equities of redemption, they could only redeem from
the purchaser by paying the full amount of the actual balance
due from Smith, when the foreclosure was made.   If they
were made parties, their rights, as to the lands bound by the
first lien, are entirely gone—unless there were fraud in obtain-
ing the decree.   The exhibit of the proceedings in the former
suit shows that, by the bill, both the trustees in the second
mortgage, and J. J. Persons & Co., the beneficiaries, were
made parties defendants.    If they were served, this was
enough, inasmuch as it is not shown that the complainants
were aware at the time that the present complainants
had any interest in the notes secured, and would, perhaps, be
enough to bind all the beneficiaries of the second mortgage in
any case.   (See *Pindall et al.* v. *Trevor & Colgate*, 30  Ark.,
p. 250.)   The transcipt of the record shows that publication
against them as non-residents in that case was duly prayed,
and the decree recites that afterwards proof of publication
was duly made.   No contest is made as to the validity of the
proof, and we may well hold that the trustees and J. J. Per-
sons & Co., were parties to the former decree, and that it
would bind all assignees of the notes—especially when it is not
shown that they were known to the complainants in that suit,
and had peculiar equities requiring their presence.

The question is not important in this case. There is no offer
to redeem.   The validity of the sale rests wholly on the ques-
tion of fraud.   The proceedings were regular and contain

nothing on their face, or in connection with matters in pais, to show any fraud or mal-practice calculated to affect the material right of the present complainant. The credits were not allowed for the sums paid by Gaines to the Crescent City Bank, and, through Adams, on the note held by Johnson. It is not plain from the proof that such credits were intended to have been made. Gaines, then, was evidently endeavoring to support Smith, and to carry him through his embarrassments, but it cannot be inferred that he meant to lay out his own money for the purpose, without security for advances. The proof conduces to show that he contemplated a subrogation to the rights of the creditors, to the extent of re-imbursement— meaning to give Smith the benefit of the discount. In that view, which, to say the least, consists with the proof, there was no fraud in foreclosing for the full amount, which the subsequent incumbrancers could complain of. If there had been any fraud in the purchase from the Commissioner, at the sale, at an inadequate price, of which there is no proof, it would only affect the rights of the complainants in that suit. They were represented by attorneys and made no complaint. With regard, therefore, to all the lands sold by the Commissioner in that suit to Gaines, the decree of the Chancellor in this case, confirming his title, was correct.

It remains to consider of the rights of complainants as to lands included in the second mortgage, and not embraced in the Commissioner's deed.

Some of these were purchased by Gaines for the taxes of 1866 and 1867. This was evidently do ie by the joint consent and concurrence of Gaines and Smith, whilst they were in amity. It was done to strengthen title. It cannot ever have that effect with those who are taking the profits and ought to keep down the taxes. This was Smith's case, and Gaines bought by understanding with him. It gave Gaines no other

right against Smith, or the encumbrancers, than that of simple re-imbursement for cash actually paid (or scrips at currency-value), with 6 per cent. interest, upon the particular tracts so lying outside the Commissioner's deed. Subject to this burden, which should be allowed Gaines out of the sales, the lands are subject to the second mortgage. It is not necessary to determine the validity of the tax sales. The taxes were due and were paid, and the lands disburdened.

The lands bought at the sale under attachment, should also be held subject to complainant's debt. The second mortgage lien is superior.

The Chancellor erred in refusing the relief sought with regard to all the lands embraced in the second mortgage (or trust) deed, and not in the lien retained upon the sale to Smith and Adams. Let the decree be reversed and the cause remanded for further proceeding, consistent with this opinion.